SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**L.A. v. D.Y.F.S. (A-55/56-12) (071921)**

**Argued January 6, 2014 -- Decided April 23, 2014**

**LaVECCHIA, J., writing for a unanimous Court.**

The issue in this appeal is whether defendants breached the duty, imposed by N.J.S.A. 9:6-8.10, to report suspected child abuse whenever a person forms a reasonable belief that a child has been subjected to child abuse.

On January 13, 2001, at about 8:00 p.m., two-year-old S.A. was brought to the emergency room of the Jersey Shore University Medical Center (JSMC) by two men who identified themselves as her relatives. They informed the triage nurse that they had been called to S.A.'s home by S.A.'s stepmother because S.A. was vomiting and unable to walk. The nurse noted that S.A. was lethargic and weak, and that she had an unusual odor on her breath. S.A. was examined by Dr. Daniel Yu, M.D., a board-certified Emergency Medicine specialist who was then an attending physician in JSMC's Emergency Department. Dr. Yu noted that S.A.'s mouth smelled of "cologne" and "chemical alcohol." Dr. Yu conducted a full examination of S.A. and performed a thorough set of diagnostic tests. Dr. Yu treated S.A. with an intravenous saline drip to prevent dehydration. The blood test results revealed that S.A. had a blood alcohol concentration of 0.035 percent.

S.A.'s father, K.L., arrived at the hospital around 8:30 p.m. He presented JSMC staff with a bottle of cologne and stayed with S.A. while she was at JSMC. Dr. Yu noted that the cologne had a similar odor to S.A.'s breath and diagnosed S.A. with accidental cologne ingestion. Dr. Yu did not record information about the cologne and did not inquire as to how S.A. had come to consume it. Neither Dr. Yu nor any of the JSMC staff noted any signs that S.A. had been abused or neglected, and the Division of Youth and Family Services (DYFS)[1] was not contacted. Subsequent to S.A.'s treatment at JSMC, S.A. received medical treatment at another physician's office for a chemical burn on her foot. No reports were made to DYFS in connection with that incident. Reports, however, were filed in connection with two other incidents, one in March and the other in April, 2001. Those incidents resulted in findings of abuse and neglect by DYFS case workers. The April 2001 incident, which included multiple burns and numerous bruises, led to the removal of S.A. from K.L.'s care and the placement of S.A. with L.A., who adopted her in April 2006.

In April 2007, L.A. filed the instant complaint individually and on behalf of S.A. against several parties, including Dr. Yu and JSMC. The complaint alleged that Dr. Yu had committed medical malpractice and had breached the standard of care set forth in N.J.S.A. 9:6-8.10 by failing to notify DYFS after treating S.A. for accidental cologne ingestion. With the exception of Dr. Yu and JSMC, all defendants settled out of court. Dr. Yu and JSMC filed motions for summary judgment. On August 13, 2010, the trial court granted summary judgment in favor of defendants, holding that no reasonable jury could find that Dr. Yu had reasonable cause to believe that child abuse had been committed against S.A. L.A.'s motion for reconsideration was denied.

The Appellate Division reversed and remanded the matter for trial. The appellate panel concluded that summary judgment was inappropriate because "a reasonable jury could find that a probable inference from the information available to Dr. Yu at the time of treatment was that [S.A.'s] condition was the result of 'reckless' or 'grossly or wantonly negligent' conduct or inaction on the part of her parent or guardian." L.A. ex rel. S.A. v. N.J. Div. of Youth & Family Servs., 429 N.J. Super. 48, 60 (App. Div. 2012). The Supreme Court granted the petitions for certification filed by Dr. Yu and JSMC. 213 N.J. 535 (2013).

---

[1] DYFS is now known as the Division of Child Protection and Permanency. For ease of reference, the Court refers to the agency as DYFS throughout this opinion.

1

**HELD**: Based on the record before the Court, the circumstances surrounding S.A.'s presentation at the hospital were insufficient to give rise to a finding that defendants behaved unreasonably in failing to report an incident of suspected child abuse, as required under N.J.S.A. 9:6-8.10.

1. To support her medical malpractice claim, plaintiff must establish: "(1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Gardner v. Pawliw, 150 N.J. 359, 375 (1997). In this case, the applicable standard of care is provided by N.J.S.A. 9:6-8.10, which requires that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse . . . shall report the same immediately to [DYFS]." When statutory language "clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms." McCann v. Clerk of Jersey City, 167 N.J. 311, 320 (2001). However, "[i]f the plain language of a statute is ambiguous or open to more than one plausible meaning," the court may look to sources of extrinsic evidence such as legislative history for assistance in determining legislative intent." State v. Marquez, 202 N.J. 485, 500 (2010). (pp. 13-15)

2. On its face, N.J.S.A. 9:6-8.10 clearly indicates that the reporting requirement is applicable to all persons. The statute also states plainly that the reporting requirement is only triggered by a "reasonable cause to believe" that child abuse has been committed. As a standard, "reasonable cause to believe," as well as its derivatives "reasonable belief," "cause to believe," and "reason to believe," have been employed in a variety of contexts. The common judicial application given to a "reasonable cause" standard in multiple settings must have been familiar to the Legislature when it used "reasonable cause to believe" as its standard for imposing a duty to report suspected child abuse. Based on a plain language reading of the statute, the Court perceives that the Legislature intended that "reasonable cause to believe" that a child has been subjected to child abuse requires a reasonable belief based on the facts and circumstances known to the person on the scene. (pp. 15- 20)

3. When the Legislature first enacted a statute providing for mandatory reporting of child abuse, that statute applied only to physicians and hospitals. In amending Title 9 in 1971, the Legislature studied and created a new requirement for reporting to child welfare authorities. The originally proposed bill mandated reporting by certain individuals, including household members and medical personnel, while providing that anyone else "may report suspicion or knowledge of child abuse." Governor Cahill conditionally vetoed the proposed bill, amending it to make the reporting requirement mandatory as to all persons and to change the standard from "suspicion or knowledge" to "reasonable cause to believe." The "reasonable cause to believe" standard, intended to be understood on its face and applicable to all persons, including physicians, imposes a requirement that is subject to the test for objective reasonableness. The statutory duty to report child abuse requires a reasonable belief based on the facts and circumstances known to the person on the scene. The judgment and actions of the person on the scene must survive the test of objective reasonableness. (pp. 20-26)

4. Based on the record before the Court, the circumstances surrounding S.A.'s presentation at the hospital were insufficient to give rise to a finding that Dr. Yu behaved unreasonably in failing to report an incident of suspected child abuse. There was no evidence of intentional behavior by S.A.'s parents or legal guardians in connection with what Dr. Yu reasonably perceived to be an accidental ingestion of cologne. Moreover, the Court cannot ignore the fact that the liquid two-year-old S.A. ingested was a common item found in many homes, and not an inherently dangerous item that no reasonable adult would allow in any accessible proximity to a child of such tender age. The idea that a toddler might find a way to get her hands on a common cosmetic or toiletry item is not equivalent to grossly negligent or reckless behavior on the part of a parent. Later tragic events in the life of this child cannot cloud the analysis when considering the objective reasonableness of Dr. Yu's first and only interaction with two-year-old S.A. Viewing the facts objectively and as presented to Dr. Yu, the Court concludes that he did not breach the reporting obligation in N.J.S.A. 9:6-8.10 in respect of S.A.'s emergency room visit and treatment for apparent accidental cologne ingestion. (pp. 26-30)

The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** to the trial court for reinstatement of its judgment dismissing this action against defendants.

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.**

L.A., as Parent and Legal
Guardian of S.A., a minor,
and L.A., individually,

    Plaintiff-Respondent,

        v.

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES; NEW
JERSEY DEPARTMENT OF HUMAN
SERVICES, now known as
DEPARTMENT OF CHILDREN AND
FAMILIES; KEVIN M. RYAN,
FORMER COMMISSIONER; EILEEN
CRUMMY, DIRECTOR OF DIVISION
OF YOUTH AND FAMILY SERVICES;
CHARLES VENTI, FORMER
DIRECTOR OF DIVISION OF YOUTH
AND FAMILY SERVICES; SHALONDA
MARTIN; RICHARD KLEIN, Ed.D.;
CATHERINE HINES, CADS;
GWENDOLYN ARMSTRONG; AUBREY
LUTZ; ANDREA STOKES; MONICA
DUDAK; and PAULETTE TARICA,

    Defendants,

        and

JERSEY SHORE UNIVERSITY
MEDICAL CENTER,

    Defendant-Respondent
    and Cross-Appellant,

        and

DANIEL YU, M.D.,

    Defendant-Appellant

1

and Cross-Respondent.

Argued January 6, 2014 – Decided April 23, 2014

On certification to the Superior Court,
Appellate Division, whose opinion is
reported at 429 N.J. Super. 48 (2012).

Hugh P. Francis argued the cause for
appellant and cross-respondent (Francis &
Berry and Buckley Theroux Kline & Petraske,
attorneys; Sean P. Buckley, of counsel;
Michael P. Opacki, on the briefs).

Richard A. Amdur argued the cause for
respondent and cross-appellant (Amdur, Maggs
& Shor, attorneys).

David A. Mazie argued the cause for
respondent (Mazie Slater Katz & Freeman,
attorneys; Mr. Mazie, David M. Freeman, and
David M. Estes, on the brief).

Mary M. McManus-Smith argued the cause for
amicus curiae Legal Services of New Jersey
(Melville D. Miller, Jr., President,
attorney; Ms. McManus-Smith, Mr. Miller, and
Jeyanthi C. Rajaraman, on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

The question presented in this medical malpractice matter concerns the statutory standard to determine when reporting of suspected child abuse is required. A toddler was brought to a hospital's emergency room for treatment of what was assessed as accidental cologne ingestion. The child was treated and released from the hospital's emergency department to the care of her father the same evening. The emergency room physician did

not report the matter as an incident of suspected child abuse. However, subsequent events in the life of this child resulted in findings that she was subjected to separate incidents of child abuse, and she was removed from the care and custody of her father and stepmother.

Based on the initial emergency room episode, the child's adoptive parent and legal guardian filed this malpractice action against the hospital and the emergency room physician who attended to the child. The complaint alleges that the doctor breached the duty imposed by N.J.S.A. 9:6-8.10 to report suspected child abuse. The hospital is named in its respondeat superior capacity.

In this medical malpractice action, all parties agree that the standard of care to which the emergency room physician should be held is expressed in N.J.S.A. 9:6-8.10. N.J.S.A. 9:6-8.10 provides the longstanding standard for the reporting of suspected child abuse: "Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately" to the State. If reasonable cause exists to believe that child abuse has occurred, a statutory duty to report arises. See N.J.S.A. 9:6-8.14 (making violation of duty punishable as disorderly person offense).

We discern in N.J.S.A. 9:6-8.10 a legislative intent to impose a universal obligation to report child abuse whenever a person forms a reasonable belief that a child has been subjected to child abuse. The statute's language and history plainly establish that the enactment was a carefully thought out imposition of a general duty, and that great care was taken when choosing "reasonable belief" as its trigger. We hold that, in light of the statute's language and history, the "reasonable belief" threshold requires an objective assessment of whether given all of the facts and circumstances known at the time a person similarly situated would have held a reasonable belief that child abuse had occurred. That interpretation is neither novel nor new and is consistent with other judicial applications of a "reasonable cause" standard.

Application of an objective reasonableness review in this matter compels the conclusion that the trial court correctly determined that, as a matter of law, defendants did not breach the statutory duty imposed by N.J.S.A. 9:6-8.10. The trial court's grant of summary judgment to those defendants was correct. We therefore reverse the contrary Appellate Division judgment.

I.

A.

The summary judgment record reveals the following. On

4

January 13, 2001, at about 8:00 p.m., two-year-old S.A. was brought to the emergency room of the Jersey Shore University Medical Center (JSMC) by two men who identified themselves as her relatives.  They informed the triage nurse that they had been called to S.A.'s home by S.A.'s stepmother because S.A. was vomiting and unable to walk.  The nurse noted that S.A. was lethargic and weak, and that she had an unusual odor on her breath.

S.A. was examined by Dr. Daniel Yu, M.D., a board-certified Emergency Medicine specialist who was then an attending physician in JSMC's Emergency Department.  Dr. Yu noted that S.A.'s mouth smelled of "cologne" and "chemical alcohol."  Dr. Yu conducted a full examination of S.A., including checking her breathing, pulse, blood sugar, mucous membranes, neck, heart, lungs, abdomen, extremities, and skin.  He also performed a thorough set of diagnostic tests, including a urinalysis, a blood test, and chest x-rays, as well as checking for metabolic disorders and internal bleeding.  Dr. Yu treated S.A. with an intravenous saline drip to prevent dehydration.  The blood test results revealed that S.A. had a blood alcohol concentration of 0.035 percent.

S.A.'s father, K.L., arrived at the hospital around 8:30 p.m.  He presented JSMC staff with a bottle of cologne and stayed with S.A. while she was at JSMC.  Dr. Yu noted that the

5

cologne had a similar odor to S.A.'s breath.  Taking into account the low body weight of this child when assessing the impact of ingesting cologne containing chemical alcohol, Dr. Yu diagnosed S.A. with accidental cologne ingestion.  Dr. Yu did not record information about the cologne such as the size of the bottle, how much cologne remained in the bottle, the brand of cologne, or the ingredients of the cologne, although he testified that he understood cologne to have a high ethanol content.  Dr. Yu also did not inquire as to how S.A. had come to consume the cologne.  While she was at JSMC, S.A. also was assessed by a pediatric resident and several nurses.  Neither Dr. Yu nor any of the JSMC staff noted any signs that S.A. had been abused or neglected, and the Division of Youth and Family Services (DYFS)[2] was not contacted.

S.A. became more alert and was able to stand by 9:30 p.m. She was discharged to K.L. at 11:20 p.m., at which time she was walking steadily and was able to tolerate fluids.

Subsequent to S.A.'s treatment at JSMC, S.A. received medical treatment at another physician's office for a chemical burn on her foot.  She was seen by that doctor on February 23, February 27, and March 1, 2001, and he made no reports to DYFS

---

[2] Pursuant to L. 2012, c. 16, effective June 29, 2012, the Division of Youth and Family Services is now known as the Division of Child Protection and Permanency.  For ease of reference, we refer to the agency as DYFS throughout this opinion.

6

in connection with the incident. On March 15, 2001, DYFS received a report of suspected child abuse concerning S.A. The caller informed DYFS that S.A. had burn marks over her body and a belt mark on her chest, and that she was being beaten by her stepmother. A DYFS case worker examined S.A. and determined that S.A.'s injuries were the result of abuse and neglect. Nevertheless, DYFS did not remove S.A. from the care of K.L. and his wife. On April 5, 2001, DYFS received a report that S.A. had been found hanging from a hook on a door with her hands bound. DYFS's investigation revealed numerous injuries inflicted on S.A.: multiple burns including ones located on her private parts, numerous bruises on her body, and a welt on her chest. She was removed from K.L.'s care, taken into DYFS's custody, and ultimately placed with L.A., who adopted her in April 2006.

B.

In April 2007, L.A. filed the instant complaint individually and on behalf of S.A. against several parties, including Dr. Yu and JSMC.[3] The complaint alleged that Dr. Yu had committed medical malpractice and had breached the standard of care set forth in N.J.S.A. 9:6-8.10 by failing to notify DYFS after treating S.A. for accidental cologne ingestion. With the

---

[3] L.A.'s complaints against Dr. Yu and JSMC, which are the only ones at issue here, were brought on behalf of S.A.

7

exception of Dr. Yu and JSMC, all defendants settled out of court.

Following the exchange of discovery, Dr. Yu and JSMC filed motions for summary judgment. On August 13, 2010, the trial court granted summary judgment in favor of defendants, holding that no reasonable jury could find that Dr. Yu had reasonable cause to believe that child abuse had been committed against S.A. The trial court concluded that the ingestion of any type of substance by a two-year-old child, in and of itself, does not create reasonable cause to believe that child abuse has been committed. L.A.'s motion for reconsideration was denied.

On appeal from the grant of summary judgment to defendants, the Appellate Division reversed and remanded the matter for trial. L.A. ex rel. S.A. v. N.J. Div. of Youth & Family Servs., 429 N.J. Super. 48 (App. Div. 2012). The Appellate Division rejected L.A.'s argument that N.J.S.A. 9:6-8.10 requires reporting of all incidents that might cause suspicion of child abuse. Id. at 56. Rather, the panel described N.J.S.A. 9:6-8.10 as requiring the reporting of injuries resulting from conduct that is "reckless, or grossly or wantonly negligent, but not conduct that is merely negligent." Id. at 58.

In addressing N.J.S.A. 9:6-8.10's "reasonable cause to believe" standard, the panel looked to N.J.S.A. 9:6-8.16 for guidance. Id. at 59. N.J.S.A. 9:6-8.16 provides that a

8

physician may take a minor into protective custody where "the child has suffered serious physical injury or injuries, and the most probable inference from the medical and factual information supplied" is that the injuries occurred by other than accidental means and were inflicted or permitted to be inflicted by the person into whose custody the child would otherwise be returned. Based on the language in those two statutes, the panel determined that reporting is required pursuant to N.J.S.A. 9:6-8.10 when a

> physician has "reasonable cause to believe" that there has been abuse if a "probable inference" from the medical and factual information available to the physician is that the child's condition is the result of child abuse, including "reckless" or "grossly or wantonly negligent" conduct or inaction by a parent or caregiver.
>
> [L.A., supra, 429 N.J. Super. at 59.]

Applying that standard in this matter, the panel concluded that summary judgment was inappropriate because "a reasonable jury could find that a probable inference from the information available to Dr. Yu at the time of treatment was that [S.A.'s] condition was the result of 'reckless' or 'grossly or wantonly negligent' conduct or inaction on the part of her parent or guardian." Id. at 60.

We granted the petitions for certification filed by Dr. Yu and JSMC. 213 N.J. 535 (2013). We also granted amicus curiae

9

status to Legal Services of New Jersey (LSNJ).

## II.

## A.

Before this Court, Dr. Yu asserts that the Appellate Division's decision misconstrues N.J.S.A. 9:6-8.10 and improperly increases the reporting requirements imposed on physicians.[4] Citing the explicit imposition of different standards for DYFS personnel to report suspected abuse in N.J.S.A. 9:6-8.36a and for doctors to take children into protective custody in N.J.S.A. 9:6-8.16, Dr. Yu argues that the Legislature intended N.J.S.A. 9:6-8.10's "reasonable cause to believe" standard to apply equally to all persons. Dr. Yu maintains that "reasonable cause" has been used in numerous statutes and long defined as "reasonable grounds for thought supported by circumstances sufficiently strong to warrant the ordinarily prudent person to believe." He argues that the Court should apply that definition to N.J.S.A. 9:6-8.10. Further, from a policy perspective Dr. Yu argues that the Appellate Division created an unworkably open-ended reporting requirement that in practice will have the undesirable result of obligating physicians to report any child injuries where an inference of abuse or neglect could be made, even when the parents offer an explanation and the physician thinks abuse or neglect is

---

[4] JSMC primarily relies on Dr. Yu's arguments.

10

unlikely.

B.

L.A. asserts that the Appellate Division did not establish a new standard, but instead clarified when a doctor has a "reasonable cause to believe" that a child has been subjected to abuse or neglect.  In other words, the "probable inference" language in N.J.S.A. 9:6-8.16 merely informs the "reasonable cause to believe" analysis.  L.A. argues that, based on the statutory framework as a whole, the Appellate Division was correct to conclude that the obligation to report under N.J.S.A. 9:6-8.10 falls between the high "most probable inference" standard for taking a child into protective custody under N.J.S.A. 9:6-8.16 and the well-established threshold requirement that something more than parental negligence is required to establish child abuse under Title 9.

Citing this Court's decision in G.S. v. Department of Human Services, 157 N.J. 161 (1999), which held that accidental ingestion of a foreign substance may be indicative of child abuse, L.A. argues that the Appellate Division did not create a new rule by holding that Dr. Yu may have had a duty to report under the circumstances.  L.A. also disputes the argument by Dr. Yu and LSNJ that the Appellate Division's interpretation of N.J.S.A. 9:6-8.10 will result in over-reporting.  She notes that the Appellate Division required "more than speculation or

11

suspicion" to trigger the requirement, and that the holding was explicitly limited to civil litigation involving professional malpractice. She also asserts that our courts have consistently found that the Legislature intended Title 9 to be construed broadly in order accomplish its purpose of protecting children from abuse, and that this intention supports the Appellate Division's interpretation of the reporting requirement.

C.

LSNJ, as amicus curiae, argues that the "reasonable cause to believe" standard used by the Legislature in N.J.S.A. 9:6-8.10 is clear, unambiguous, and has been extensively interpreted by our courts in a variety of contexts. LSNJ asserts that N.J.S.A. 9:6-8.10 was carefully designed, with this standard used to achieve a delicate balance between (1) the danger of under-reporting potential child abuse at the expense of child safety and wellbeing and (2) the danger of over-reporting at the expense of unnecessary trauma and disruption to families and children. LSNJ urges our Court to take into account the potential for harm from over-reporting, including intrusion on fundamental liberties and family autonomy, and the distress and uncertainty experienced by children during investigations and removals. In the case of doctors specifically, LSNJ notes that increased reporting may lead families to forego important medical services or be less candid

12

with their doctors for fear of reporting to DYFS. LSNJ also emphasizes the particular impact that over-reporting would have on low-income and minority children and families, who are significantly overrepresented in the child welfare system and are disproportionately likely to use emergency rooms, where many DYFS reports originate, as their primary source of healthcare.

III.

A.

This medical malpractice case is before this Court from the Appellate Division's reversal of the trial court's grant of summary judgment for Dr. Yu and JSMC. In reviewing a grant of summary judgment, we review the decision de novo, applying the same standard as the trial court. Coyne v. N.J. Dep't of Transp., 182 N.J. 481, 491 (2005). Summary judgment should be granted where "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). An issue of material fact exists where "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995).

To support her medical malpractice claim, plaintiff must

13

establish: "(1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Gardner v. Pawliw, 150 N.J. 359, 375 (1997) (citations omitted). As noted, the parties to this case agree that the applicable standard of care is provided by N.J.S.A. 9:6-8.10, which requires that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse . . . shall report the same immediately to [DYFS]." They disagree as to how this standard, and specifically the phrase "reasonable cause to believe," should be interpreted and applied to physicians.

B.

The goal in statutory interpretation is "to discern and effectuate the intent of the Legislature." Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012). To accomplish that goal, a court first looks to the plain language of the statute, "which is typically the best indicator of intent." In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 467 (2013). When statutory language "clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms." McCann v. Clerk of Jersey City, 167 N.J. 311, 320 (2001) (internal quotation marks omitted). "A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature

14

intended something other than that expressed by way of the plain language." O'Connell v. State, 171 N.J. 484, 488 (2002).

However, "[i]f the plain language of a statute is ambiguous or open to more than one plausible meaning," the court may look to sources of extrinsic evidence such as legislative history for assistance in determining legislative intent. State v. Marquez, 202 N.J. 485, 500 (2010); Marino v. Marino, 200 N.J. 315, 329 (2009). Our desired result is to effectuate sensibly the statutory words and underlying legislative intent of the enactment whose application is in issue.

IV.

A.

In relevant part, N.J.S.A. 9:6-8.10 provides:

> Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise.

On its face, the language of this provision clearly indicates that the reporting requirement is applicable to all persons. In referring to "any" person, the provision carves out no one. The statute also states plainly that the reporting requirement is only triggered by a "reasonable cause to believe" that child abuse has been committed.

In past cases, we have employed N.J.S.A. 9:6-8.10's

15

"reasonable cause to believe" standard without uncertainty or interpretive explanation.  See, e.g., N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 29 (2013) (quoting N.J.S.A. 9:6-8.10's requirement that "'[a]ny person having reasonable cause to believe' that a child has been abused" must report the information to DYFS and stating "[t]here is no doubt that the presence of cocaine metabolites in the meconium of a newborn child should trigger a report to the Division"); Frugis v. Bracigliano, 177 N.J. 250, 271 (2003) (stating that school personnel who observed principal's sexually suggestive behavior with children "had an independent obligation to report directly to DYFS" and their "failure to do so, standing alone, was evidence of negligence"); see also F.A. by P.A. v. W.J.F., 280 N.J. Super. 570, 578 (App. Div. 1995) (interpreting N.J.S.A. 9:6-8.13's grant of immunity for reporting suspected child abuse pursuant N.J.S.A. 9:6-8.10 as requiring use of an objective test for reasonableness:  "The test will be whether a reasonable person would have reasonable cause to believe that a child has been abused.").

That said, as a standard, "reasonable cause to believe," as well as its derivatives "reasonable belief," "cause to believe," and "reason to believe," have been employed in a variety of

16

contexts.[5]  See, e.g., <u>Stengart v. Loving Care Agency, Inc.</u>, 201

<u>N.J.</u> 300, 325-26 (2010) (finding law firm's review of privileged

emails violated <u>RPC</u> 4.4(b), which provides that "lawyer who

receives a document and has reasonable cause to believe that

[it] was inadvertently sent" shall not read it); <u>Application of</u>

<u>Ries</u>, 20 <u>N.J.</u> 140, 145, 159 (1955) (assessing petition for

investigation of township's conduct of municipal affairs and

interpreting statutory standard of "cause to believe" municipal

or county monies "are being, or have been, unlawfully or

corruptly expended" as requiring "reasonable cause to believe");

<u>see also</u> <u>Carmona v. Resorts Int'l Hotel, Inc.</u>, 189 <u>N.J.</u> 354,

372-73 (2007) (discussing requirement in New Jersey Law Against

Discrimination action that plaintiff have "reasonable belief"

---

[5] Our research reveals that the Legislature has used the phrase "reasonable cause to believe" in more than sixty statutes predating and postdating the enactment at issue before us.  <u>See,</u> <u>e.g.,</u> <u>N.J.S.A.</u> 45:1-35 (providing immunity for reporting by person with reasonable cause to believe medical professional's actions involve disciplinable misconduct); <u>N.J.S.A.</u> 52:27D-419 (requiring reporting to law enforcement based on reasonable cause to believe criminal act has been committed against vulnerable adult); <u>N.J.S.A.</u> 52:27D-409 (requiring reporting to adult protective services based on reasonable cause to believe vulnerable adult is subject of abuse); <u>N.J.S.A.</u> 39:3-72 (allowing stop of vehicle based on reasonable cause to believe vehicle's tires violate statutory safety requirements); <u>N.J.S.A.</u> 17:16C-15 (allowing Commissioner of Banking to make investigations based on reasonable cause to believe person has violated Retail Installment Sales Act); <u>N.J.S.A.</u> 33:1-66 (requiring law enforcement officer to investigate based on reasonable cause to believe person is engaged in unlawful alcoholic beverage activity and to seize property based on reasonable ground to believe property is unlawful).

that employer engaged in unlawful discrimination); State v. Lund, 119 N.J. 35, 39-40 (1990) (stating that, in order to conduct frisk, police must have "reasonable belief" or "reason to believe" that person is armed and dangerous).

The "reasonable cause to believe" standard is thus a familiar touchstone. Moreover, as our cases demonstrate, its application results in substantially similar analyses that objectively test the reasonableness of a person in particular circumstances. See, e.g., Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443, 455-56 (1989) (discussing how, when assessing officer's use of force, Fourth Amendment's reasonableness requirement must be judged from perspective of on-the-scene officer, and actions must be objectively reasonable in light of facts and circumstances confronting officer); see also DelaCruz v. Borough of Hillsdale, 183 N.J. 149, 165-66 (2005) (discussing same); F.A., supra, 280 N.J. Super. at 578 (applying objective reasonableness test in granting immunity for child abuse reporting).

The common judicial application given to a "reasonable cause" standard in multiple settings must have been familiar to the Legislature when it used "reasonable cause to believe" as its standard for imposing a duty to report suspected child abuse. See, e.g., Bhd. of R.R. Trainmen v. Palmer, 47 N.J. 482, 486-87 (1966) (requiring minimal judicially mandated

18

administrative hearing processes because "Legislature is presumed to know the construction placed by the courts on a statutory requirement for [a] hearing"); Eckert v. N.J. Hwy. Dep't, 1 N.J. 474, 479 (1949) ("In construing legislation we must assume the Legislature was thoroughly conversant with its own legislation and the judicial construction placed thereon."). The Legislature's selection of a "reasonable cause" standard in N.J.S.A. 9:6-8.10 signals a preference for a reasonableness obligation, which courts have enforced using an objective standard of review applied to the perceptions and actions of the person on the scene. N.J.S.A. 9:6-8.10's inclusion of language imposing a "reasonable cause" standard compels a strong belief that the Legislature intended to follow the common application given to that standard in other settings.

Thus, based on a plain language reading of the statute, we perceive that the Legislature intended that "reasonable cause to believe" that a child has been subjected to child abuse requires a reasonable belief based on the facts and circumstances known to the person on the scene. The reasonableness of forming that belief, or, as here, the reasonableness of not forming that belief, must be tested based on the circumstances of the case and requires an individualized assessment of what the person on the scene observed or discerned. In that review, the actions of the person on the scene must be objectively reasonable given the

19

facts and circumstances known to that person.

Although that is commonly how "reasonable cause to believe" has been applied in other settings, we address the argument that a variation to N.J.S.A. 9:6-8.10's standard should apply to doctors.  To further our review of that possible interpretation, we turn to the legislative history on the provision in issue.

B.

In 1964, when the Legislature first enacted a statute providing for mandatory reporting of child abuse, that statute applied only to physicians and hospitals.  See L. 1964, c. 30. Specifically, that statute provided in relevant part:

> Any physician having reasonable cause to suspect that any child under the age of 18 brought to him or coming before him for examination, care or treatment . . . has had serious physical injury or injuries inflicted upon him by other than accidental means by a parent, parents, guardian, or person having custody and control of the child, shall immediately report or shall cause to be reported to the county prosecutor of the county in which the child resides such injury or injuries in accordance with the provisions of this act.
>
> [Id. at § 3, codified at N.J.S.A. 9:6-8.1, repealed by L. 1974, c. 119, § 54.]

A physician making such a report to a prosecutor was given immunity from liability, civil or criminal, that might be incurred as a result of making the report, id. at § 6, and "knowingly and wilfully" failing to report was made a

20

misdemeanor, <u>id.</u> at § 7.  That provision was repealed by the Legislature in 1974.  <u>See</u> <u>L.</u> 1974, <u>c.</u> 119, § 54.

In amending Title 9 in 1971, the Legislature studied and created a new requirement for reporting to child welfare authorities.  <u>See</u> <u>L.</u> 1971, <u>c.</u> 437, § 3.  The originally proposed bill provided that "[a]ny person may report suspicion or knowledge of child abuse," while a number of specifically listed individuals (including household members, prosecutors, social workers, school officials, and medical personnel) "shall report suspicion or knowledge of child abuse."  S. 747, 194th Leg. (Apr. 6, 1970).  Although the proposed bill passed both houses of the Legislature, Governor Cahill exercised his conditional veto power in respect of the reporting requirement, amending it to provide that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same promptly to the Bureau of Children's Services by telephone or otherwise."  <u>See</u> <u>Governor's Conditional Veto to Senate Bill No. 747</u>, at 2 (Nov. 15, 1971).  In justifying the change included in the conditional veto, Governor Cahill explained that

> Section 3 deals with the reporting of "suspicion or knowledge of child abuse"; as to some persons the reporting of "suspicion of child abuse" is made mandatory.  The meaning and connotation of the word "suspicion" is legally too ill-defined to be helpful or appropriate in this context.

21

> What is desired is that a report should be made whenever there is reasonable cause to believe an offense has been committed. Imposing an absolute requirement that "suspicion" be reported provides an invitation to abuse, harassment and litigation, none of which will assist in the alleviation of this serious problem.
>
> [Id. at 1.]

Governor Cahill's conditional veto language was adopted by both Houses of the Legislature. See L. 1971, c. 437, § 3. Subsequent amendments to the provision have merely updated the name of the agency to which reports shall be made. See L. 1987, c. 341, § 4; L. 2012, c. 16, § 21.

A governor's conditional veto of a bill is a significant source of insight into the legislative intent underlying a provision affected by the conditional veto. See Fisch v. Bellshot, 135 N.J. 374, 386 (1994). A governor's conditional veto message often states with particularity why the changed language is essential for a passed bill to secure the governor's signature and be enacted into law. Thus, we have recognized that a governor's conditional veto provides legitimate information to be "considered in determining legislative intent, and may be 'strong evidence' of that intent when the veto directly affects that part of the legislation to be construed." DiProspero v. Penn, 183 N.J. 477, 503 (2005). Here, Governor Cahill exercised his conditional veto to make the reporting

22

requirement mandatory as to all persons and to change the standard from "suspicion or knowledge" to "reasonable cause to believe." His statement indicates that these changes were connected. Because the "suspicion" standard was "legally too ill-defined" and was "an invitation to abuse, harassment and litigation," the standard was changed to "reasonable cause to believe." Moreover, because reporting was desired "whenever there is reasonable cause to believe an offense has been committed," reporting was made mandatory for all persons.

## C.

That legislative history, read in connection with the entirely straightforward language of N.J.S.A. 9:6-8.10, supports the conclusion that "reasonable cause to believe" was intended as a standard that would be understandable on its face, and that would be applicable to all persons who come into contact with children who may be victims of child abuse. The "any persons" language in N.J.S.A. 9:6-8.10 and the Legislature's failure to enact a reporting requirement specific to physicians after N.J.S.A. 9:6-8.1 was repealed indicate that the standard set forth in N.J.S.A. 9:6-8.10 is presently intended to apply to physicians.

Although we find N.J.S.A. 9:6-8.10 to be clear on its face, and find our interpretation of its application to be supported by its legislative history, we briefly address the proposition,

23

put forward by L.A. and the Appellate Division, that N.J.S.A. 9:6-8.16 should inform our understanding of when a physician has "reasonable cause to believe" that child abuse has been committed.

N.J.S.A. 9:6-8.16, which was enacted in 1973 and is the only provision of Title 9 specifically addressed to physicians, provides:

> Any physician examining or treating any child, or the director or his designate of any hospital or similar institution to which any child has been brought for care or treatment, is empowered to take the said child into protective custody when the child has suffered serious physical injury or injuries, and the most probable inference from the medical and factual information supplied, is that the said injury or injuries were inflicted upon the child by another person by other than accidental means, and the person suspected of inflicting, or permitting to be inflicted, the said injury upon the child, is a person into whose custody the child would normally be returned.

Under this provision, a physician is authorized to take the more extreme step of placing a child in protective custody instead of simply filing a report with DYFS. However, to warrant such action, the child must have suffered from a "serious physical injury" and "the most probable inference from the medical and factual information" must be that the injuries were inflicted or permitted to be inflicted by the person to whose care the physician would return the child. Ibid.

24

(emphasis added).  Moreover, whereas under N.J.S.A. 9:6-8.10 a person with reasonable cause to believe a child has been subject to abuse "shall report" the incident to child welfare authorities, under N.J.S.A. 9:6-8.16 the physician is "empowered," but not required, to take the child into protective custody.  The two provisions by their very language reveal that they pertain in different circumstances.  More importantly, nothing in the language of either provision suggests that they should be read together.  The Appellate Division erred in coupling the two provisions and setting forth a wholly new standard, untethered to the literal language of N.J.S.A. 9:6-8.10.

N.J.S.A. 9:6-8.10 is the only statute that addresses the general requirement for reporting to DYFS and it uses the familiar and well-understood standard of "reasonable cause to believe."  We hold that the phrase "reasonable cause to believe," as used in N.J.S.A. 9:6-8.10, imposes a requirement that is subject to the test for objective reasonableness.  The statutory duty to report child abuse requires a reasonable belief based on the facts and circumstances known to the person on the scene.  In other words, was it reasonable for the person who must decide whether to report to believe that abuse has occurred, taking into account the background of that person and the facts and circumstances known to him or her at the time?  In

each instance, the reasonableness of forming, or not forming, a belief that an incident of child abuse has occurred must be tested based on the circumstances of the case.  In that review, the judgment and actions of the person on the scene must survive the test of objective reasonableness.

V.

Having defined the standard under which any person, including a doctor like Dr. Yu, is required to report suspected child abuse, we turn to whether Dr. Yu's failure to make such a report in this case was in breach of the standard.

N.J.S.A. 9:6-8.9 defines actions that constitute child abuse for the purpose of the reporting requirement at issue in this case.  In relevant part, this provision defines "abused child" as

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, or such other person having his custody and control, to exercise a minimum degree of care . . . (2) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other act of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.9(d).[6]]

_____

[6] Subsections (a) and (b) of this provision describe injury inflicted, or risk of injury created, by "other than accidental

In G.S., supra, we considered identical language in N.J.S.A. 9:6-8.21(c)(4)(b), and concluded that "the phrase 'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." 157 N.J. at 178. We held that "a guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. In Department of Children and Families v. T.B., we clarified that the statute applies to "grossly negligent or reckless" conduct by the parent or guardian but does not cover conduct that is "merely negligent." 207 N.J. 294, 307 (2011).

Although G.S. and T.B. involved abuse and neglect findings by DYFS rather than the duty to report child abuse, the interpretation of N.J.S.A. 9:6-8.21(c)(4)(b) that we espoused in those cases is applicable to the identical language of N.J.S.A. 9:6-8.9(d). See Oldfield v. N.J. Realty Co., 1 N.J. 63, 69 (1948) ("[T]he general rule is that where a word or phrase

means." Like the Appellate Division, "we are aware of no facts in the record to support a reasonable belief that [S.A.'s ingestion of the cologne] was the result of deliberate conduct." L.A., supra, 429 N.J. Super. at 60 n.8. To the extent that L.A. points to opinion statements in the report of her expert that cologne tastes badly, that additives are often included to deter ingestion, and that, in his experience, cologne is normally spit out, such statements are at best a speculative basis on which to rest a claim of intentional ingestion. We regard L.A.'s expert's speculative comments in his report as legally insufficient to generate a trial requirement in this matter.

occurs more than once in a statute, it should have the same meaning throughout, unless there is a clear indication to the contrary . . . ."). Dr. Yu therefore was required to report S.A.'s emergency room treatment to DYFS if, objectively viewing the circumstances of the child's admittance, an emergency medicine specialist involved in handling this treatment should have believed that S.A.'s parents or guardians had been reckless or grossly negligent in supervising her or in allowing her to access and/or consume the cologne.

Based on the record before us, we agree with the trial court that, objectively viewed, the circumstances surrounding S.A.'s presentation at the hospital were insufficient to give rise to a finding that Dr. Yu behaved unreasonably in failing to report an incident of suspected child abuse. As all the courts reviewing this matter have noted, there was no evidence of intentional behavior by S.A.'s parents or legal guardians in connection with what Dr. Yu reasonably perceived to be an accidental ingestion of cologne.

To the extent that in G.S. and T.B. we recognized that grossly negligent or reckless conduct can sustain an abuse and neglect finding and, therefore, can provide the underpinnings to a potentially reportable event, we cannot ignore the fact that the liquid two-year-old S.A. ingested was a common item found in many homes. It was not an inherently dangerous item such as an

acid, a poison, a gun, or a non-household, sharp cutting instrument that no reasonable adult would allow in any accessible proximity to a child of such tender age.  While child-proofing of homes is not a new or revolutionary precaution in modern life, the idea that a toddler might find a way to get her hands on a common cosmetic or toiletry item is not equivalent to grossly negligent or reckless behavior on the part of a parent.  Were that to be so, every accidental ingestion case presenting at a hospital emergency room would risk becoming a mandatory child abuse reporting incident.  We do not believe that the reporting obligation was meant to operate in such fashion.  Indeed, it would foster over-reporting, something the Legislature and Governor Cahill cast a wary eye toward when fashioning the standard for requiring reporting.[7]

We add only that later tragic events in the life of this child cannot cloud the analysis when considering the objective reasonableness of Dr. Yu's first and only interaction with two-year-old S.A.  Given that S.A. had no prior history of hospital involvement at JSMC, the circumstances support Dr. Yu's diagnosis and treatment of S.A.'s symptoms and do not render

---

[7] We note in particular the potential negative consequences for low-income individuals who must resort to emergency room facilities for health care needs and who might resist seeking medical help for fear of overly protective medical personnel reporting suspected child abuse in order to avoid future liability.

29

objectively unreasonable his failure to report suspected child abuse. That later episodes of child abuse transpired in this child's life does not mean that Dr. Yu erred in not detecting something prescient of those subsequent events based on his emergency room interaction with S.A. involving her ingestion of a common household item like cologne.

In sum, viewing the facts objectively and as presented to Dr. Yu, we conclude that he did not breach the reporting obligation in N.J.S.A. 9:6-8.10 in respect of S.A.'s emergency room visit and treatment for apparent accidental cologne ingestion.

## VI.

The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for reinstatement of its judgment dismissing this action against defendants Dr. Yu and JSMC.

CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and FERNANDEZ-VINA; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.

SUPREME COURT OF NEW JERSEY

NO.   A-55/56                          SEPTEMBER TERM 2012

ON CERTIFICATION TO      Appellate Division, Superior Court


L.A., as Parent and Legal
Guardian of S.A., a minor,
And L.A., individually,

      Plaintiff-Respondent,

               v.

NEW JERSEY DIVISION OF YOUTH
AND FAMILY SERVICES; NEW
JERSEY DEPARTMENT OF HUMAN
SERVICES, now known as
DEPARTMENT OF CHILDREN AND
FAMILIES; KEVIN M. RYAN,
FORMER COMMISSIONER; EILEEN
CRUMMY, DIRECTOR OF DIVISION
OF YOUTH AND FAMILY SERVICES;
CHARLES VENTI, FORMER
DIRECTOR OF DIVISION OF YOUTH
AND FAMILY SERVICES; SHALONDA
MARTIN; RICHARD KLEIN, Ed.D.;
CATHERINE HINES, CADS;
GWENDOLYN ARMSTRONG; AUBREY
LUTZ; ANDREA STOKES; MONICA
DUDAK; and PAULETTE TARICA,

      Defendants,

          and

JERSEY SHORE UNIVERSITY
MEDICAL CENTER,

      Defendant-Respondent
      and Cross-Appellant,

         and

DANIEL YU, M.D.,

      Defendant-Appellant
      and Cross-Respondent.


1

DECIDED          April 23, 2014
                 Chief Justice Rabner          PRESIDING

OPINION BY        Justice LaVecchia

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |